UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICIA IURATO, Plaintiff, | : | |
| v. | : | 3:24-CV-00772 (SFR) |
| SOUTHERN NEW ENGLAND TELEPHONE COMPANY, Defendant. | : | |

## MEMORANDUM & ORDER

Plaintiff Patricia Iurato ("Iurato") filed a four-count Complaint against Defendant Southern New England Telephone Company ("Frontier"), alleging age and gender discrimination in violation of federal law (Counts One and Two) and Connecticut state law (Count Three), as well as illegal retaliation for protected speech in violation of Connecticut state law (Count Four). Frontier has moved for summary judgment on all counts, arguing that Iurato did not suffer an adverse employment action and was not subjected to discrimination or retaliation. For the following reasons, I grant summary judgment as to Counts One, Two, and Three, and decline to exercise supplemental jurisdiction over Count Four.

## I. BACKGROUND

### A. Factual Background

The following facts are undisputed unless otherwise noted.[1] Frontier hired Iurato on February 3, 2020, when Iurato was 65 years old. Pl.'s L.R. 56 (a)(2) St. ¶ 1. Effective October

[1] The factual background is drawn from facts admitted in Iurato's Local Rule 56(a)(2) Statement of Facts submitted in response to Frontier's Motion for Summary Judgment ("Pl.'s L.R. 56(a)2 St."), ECF No. 52, and various exhibits attached to the parties' statements. Citations to the Rule

1, 2020, Frontier promoted Iurato to Director of Enterprise Sales, where she reported to Donnie Hudson, Regional Vice President. *Id.* ¶ 2. Iurato's team of Senior Enterprise Account Executives ("EAEs") dealt exclusively with customers with established accounts (called the "enterprise base") and focused on retaining those customers' recurring business and selling additional services as needed (referred to as "new business"). Iurato Dep. 37-38, 42-43, ECF No. 51-1. After absorbing and reorganizing a team in late 2021, Iurato ended the year managing a team of six EAEs. *Id.* at 57. In January 2022, Iurato was down to five EAEs and in May 2022, Iurato had only four. ECF No. 51-2, at 1.

Enterprise sales team members received incentive compensation for new business, called monthly recurring revenue("MRR"). Iurato Dep. 73, ECF No. 51-1; ECF No. 51-5, at 3-5, 16. Rate plan increases for existing customers were not considered new business. Iurato Dep. 73, ECF No. 51-1. However, according to Iurato, some EAEs were entering rate plan increases without the proper paperwork and claiming them as new business. *Id.* at 73, 84. In July 2022, Iurato complained to Hudson about this practice, which she viewed as fraudulent. *Id.* at 86-87.

On July 17, 2022, Iurato emailed Marisa Miner, Senior Director of Sales Compensation, who had recently arrived at Frontier. Iurato explained that the new compensation plan no longer provided compensation for contracts of less than a year—thus closing the loophole in the previous compensation plan that had permitted EAEs to claim rate

---

56(a)2 Statements are by paragraph number. Citations to depositions are to the internal pagination of the instant deposition. With respect to other documents, page citations are to the page number generated by the ECF system. Iurato admits all facts in Defendant's Local Rule 56(a)1 Statement, although some facts are admitted "with clarification." Iurato does not submit a statement of Additional Material Facts.

plan increases as sales contributing to MRR. ECF 43-7; Pl.'s L.R. 56(a)(2) St. ¶ 8. In December 2022, Iurato reported to several people at Frontier her belief that that some EAEs were still using the loophole because their business numbers were increasing again. Iurato Dep. 94, ECF No. 51-1.

As a Director of Enterprise Sales, Iurato was responsible for the sales quota of the sales employees that reported to her and their quotas would roll up into hers. Pl.'s L.R. 56(a)(2) St. ¶ 15. The number of sales employees that reported to any one Manager or Director ("headcount") could change due to transfers, leaves of absence, or terminations. Iurato's headcount changed over the course of her employment. *Id.* ¶ 16. When a sales employee left a team, that Manager or Director was responsible for hiring and filling the position on their team. *Id.* ¶ 17. Prior to August 2022, when a salesperson left, Managers or Directors would receive quota relief until the position was filled. *Id.* ¶ 18. Quota relief meant that the sales quota for that open headcount was removed from the leader's quota until the leader hired and filled the open headcount. *Id.*

Iurato reported to Hudson until Hudson left Frontier in early December 2022. After Hudson's departure, Iurato reported to Niraj Singh, Senior Vice President of Enterprise Sales. *Id.* ¶ 5. Singh was hired to make changes with the goal of having Frontier become profitable after it came out of bankruptcy. *Id.* ¶ 6. After Singh joined Frontier, all sales teams were subject to no quota relief for open headcounts because everyone was expected to deliver on their numbers. *Id.* ¶ 19. This change was "about driving behavior" because if a leader had an open headcount, Singh wanted to "drive the urgency that they need to fill those positions." *Id.*; Singh Dep. 182-183, ECF No. 43-5. This change applied across all sales leaders regardless of region and no exceptions were made. Pl.'s L.R. 56(a)(2) St. ¶ 19. Iurato testified that no one made

any comments to her suggesting that Singh's policy of no quota relief for open headcounts was based in any way on her age or gender. *Id.* ¶ 21.

On November 4, 2022, Singh emailed Iurato and other sales leaders, all bcc'd, with the subject "Outreach to October quota underperformers" stating that they did not meet their team quota for October and asking for an action plan to reach their targets. *Id.* ¶ 23. Iurato understood that Singh was inviting all such underperformers, including her, to seek his assistance. *Id.* ¶ 24.

Effective January 1, 2023, Frontier reorganized its Enterprise Sales Department. *Id.* ¶ 34. In the reorganization announcement, Singh explained: "Existing customers and prospects are allocated to territories based on their primary address and/or headquarters. AEs are outside sales teams; therefore, they need to be geographically close to their customers for in-person meetings and site visits." *Id.* The announcement further stated: "The new Territory model also means that employees may report to a different leader based on their physical location and the module design." *Id.* Singh's reorganization goal at Frontier was to "make every region equitable" and "make sure that nobody was driving more than two hours" to go see customers based on where they were living. *Id.* ¶ 36. As part of the reorganization, Frontier made changes "across the country" that affected "every region, every sub-region in the country." *Id.* Heather Morell, Vice President of Sales Operations, explained that "[t]he territories [were] built purely by geography, and I tried to keep them as equitable as possible, while staying within driving distance of the center of the territory." *Id.* ¶ 37.

In early 2023, the East Region lacked a permanent Regional Vice President, so Singh personally conducted performance evaluations and, where warranted, issued performance improvement plans ("PIPs") to Directors and Managers in that region. *Id.* ¶ 46. In Iurato's

Performance Appraisal for 2022, Singh rated Iurato a "1 – Does Not Meet Expectations" out of a scale of 5. *Id.* ¶ 47. Singh included a chart reflecting that Iurato's MRR percentage attained for the second half of 2022 was 45.8%. *Id.* Singh noted Iurato had "very disappointing [sales] results for 2022" and "focused on a lot of things but did NOT deliver the results, not even close." *Id.* At her deposition, Iurato acknowledged that she did not meet her MRR quota for 2022. *Id.* ¶ 48; Iurato Dep. 209, ECF No. 43-2.

Singh testified that he did not base his evaluation of Iurato in any way on her age or sex. Pl.'s L.R. 56(a)(2) St. ¶ 49. At or about the same time that Singh prepared Iurato's 2022 Performance Appraisal, Singh also rated Anthony Rome (male, age 52) a "1 – Does Not Meet Expectations" in his 2022 Performance Appraisal. *Id.* ¶ 50. Singh included a chart reflecting Rome's MRR percentage attained for the second half of 2022 was 34.5% and commented, "[v]ery disappointing results" and "[a]s a leader you are expected to take control of your destiny and help your AEs with theirs." *Id.*

According to Singh, his rating on the scale of 1 through 5 was based on MRR attainment and no other metrics. *Id.* ¶ 52; Singh Dep. 186, ECF No 43-5. "[E]verybody's performance review was based on the current criteria that we had set to measure performance" which was "MRR attainment." Pl.'s L.R. 56(a)(2) St. ¶ 52; Singh Dep. 184-85, ECF No 43-5.[2] Iurato admits that Singh had meetings with all the leaders to make sure that "everybody used the same yardstick." Pl.'s L.R. 56(a)(2) St. ¶ 52; Singh Dep. 185-86, ECF No 43-5.

[2] Iurato admits these previous two statements "with clarification." In particular, Iurato states that Singh's criteria for each performance rating level was not identified and Iurato disputes what exactly her MRR was. Pl.'s L.R. 56(a)(2) St. ¶ 52.

On February 7, 2023, Iurato had her 2022 performance evaluation meeting over Zoom with Singh and Dara Chenevert, Senior Human Resources Business Partner. Pl.'s L.R. 56(a)(2) St. ¶ 62. During that meeting, Singh informed Iurato that she received a rating of 1 out of 5 and he was putting her on a PIP. *Id.* ¶ 63. Singh also explained that the PIP was a plan to help her get better. *Id.*

In response, Iurato said she had a different plan and submitted her written resignation effective immediately on February 7, 2023. *Id.* ¶ 66. Iurato stated that she "lost faith in Frontier valuing [her] as an experienced leader" and "[l]eadership is more than just a number." *Id.* By saying leadership is more than just a number, Iurato meant that Singh was just "looking at a number and saying you're a failure. He didn't look at anything else." *Id.*; Iurato Dep. 232, ECF No. 43-2. Iurato understood from her prior experience discussing PIPs with subordinate employees that a PIP provides a period of time in which to improve. Pl.'s L.R. 56(a)(2) St. ¶ 64. Iurato never reported to anyone in Human Resources at Frontier that she felt she was being treated unfairly based on her age or gender. *Id.* ¶ 69.

When Singh placed an employee on a PIP, it was not a termination of employment; it rather was a notice of the need and opportunity for improvement. *Id.* ¶ 55. Singh testified that there were "a lot of people that went on PIP, came out of PIP and became good performers." *Id.*; Singh Dep. 189, ECF No 43-5. Lyons, the Vice President of Human Resources, further testified that "a performance improvement plan does not mean you're getting terminated . . . . It's very common to give employees feedback and then . . . they end up improving. That's the purpose of it." Pl.'s L.R. 56(a)(2) St. ¶ 56; Lyons Dep. 82, ECF No. 43-6. PIPs are about quota and provide an opportunity for an employee to improve their performance based on whether or not they are meeting quota. Pl.'s L.R. 56(a)(2) St. ¶ 56 Frontier has had many employees

who improved after being placed on PIP and are still with the company. *Id.* In the East Region, Singh placed both Iurato and Rome on PIPs. *Id.* ¶ 57. Rome signed and acknowledged his PIP, stating "I believe in my team, and I know we will show immediate and sustained improvement." *Id.* ¶ 60. Rome remained employed at Frontier for two years after being placed on the PIP. *Id.*

Jennifer Macdonald (female, age 46) was hired to replace Iurato as the Director of Enterprise Sales for the East region. *Id.* ¶ 71.

### B. Procedural History

Iurato initiated this case when she filed her Complaint on April 26, 2024. Compl., ECF No. 1. On July 16, 2025, this case was transferred to me. On December 15, 2025, Frontier filed a Motion for Summary Judgment, ECF No. 42, and an accompanying Memorandum of Law ("Defs.' Mem."), ECF No. 43. On February 17, 2026, Iurato filed her Memorandum in Opposition to Frontier's Motion for Summary Judgment ("Pl.'s Mem."), ECF No. 51.[3] On March 3, 2026, Frontier filed its Reply brief ("Def.'s Reply"), ECF No. 53.

## II. LEGAL STANDARD

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—

[3] Plaintiff appears to have submitted her Memorandum in Opposition twice, at ECF Nos. 50 and 51. I cite to the Memorandum submitted as part of ECF No. 51 because that filing includes the attached exhibits.

if eventually proven at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. See generally *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam); *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023).

## III. DISCUSSION

Iurato brings claims asserting discrimination on the basis of age and sex and a claim asserting retaliation for protected speech in violation of Connecticut state law. Compl. 25-28. Count One of the Complaint alleges a claim of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"). Count Two alleges claims of sex and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). Count Three alleges claims of age, sex, and gender discrimination under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b)(1) ("CFEPA"). Iurato's Memorandum in Opposition to Defendant's Motion for Summary Judgment contains no analysis of her sex and gender discrimination claims. *See* Pl.'s Mem. 21-26. Thus, I consider Iurato's claims of sex and gender discrimination under Title VII and CFEPA abandoned. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

### A. Age Discrimination

Age discrimination claims under ADEA are examined under the burden-shifting framework of *McDonnell Douglas*. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 302 n.3 (2d Cir. 2021). Under this framework, a plaintiff must make a *prima facie* showing

that (1) she is a member of the protected age group; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Id.* If the plaintiff makes a *prima facie* showing, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant offers such a reason, the burden shifts back to the plaintiff to show that the reason the defendant proffered was pretextual. *Id.* Discrimination claims under CFEPA are subject to the same *McDonnell Douglas* burden-shifting framework. *Sanders v. Zurich Am. Ins. Co.*, 818 F. Supp. 3d 309, 325 (D. Conn. 2026).[4]

Here, Frontier does not dispute that Iurato is a member of the protected age group nor that she was qualified for her role. Def.'s Mem. 15.[5] Therefore, I begin my analysis with the third prong of the *McDonnell* burden-shifting framework: whether Iurato suffered an adverse employment action.

**1. Adverse Employment Action**

In its opening memorandum, Frontier asserts that Iurato did not suffer an adverse employment action. Def.'s Mem. 15. In response, Iurato argues that Iurato's treatment at Frontier amounted to a constructive discharge and thus an adverse action. Pl.'s Mem. 21. Iurato

[4] Iurato argues that CFEPA imposes a lower burden for plaintiffs than the ADEA with respect to causation. Pl.'s Mem. 23-24. Causation analysis takes place in the third step of the *McDonnell Douglas* framework. Because I find that Iurato fails to make a *prima facie* case, I do not reach the question of whether the causation standard differs between federal and Connecticut age discrimination law. *See Soares v. Altice Tech. Servs. US, LLC*, No. 3:19-CV-1975 (JBA), 2021 WL 3475704, at *5-*6 (D. Conn. Aug. 6, 2021).

[5] Citations to Frontier's memorandum in support of summary judgment are to the memorandum's internal pagination rather than the page number generated by the ECF system.

does not claim that any other actions or circumstances during her employment at Frontier constituted adverse actions for purposes of her discrimination claims. In its reply, Frontier does not dispute that a constructive discharge is an adverse action but asserts that the undisputed facts show Iurato was not subject to constructive discharge. Def.'s Reply 3. I agree with Frontier that Iurato has failed to provide evidence from which a reasonable juror could conclude that she was constructively discharged.

"A plaintiff may prove a *constructive discharge* by establishing that his employer, rather than acting directly, deliberately made his working conditions *so intolerable* that he was forced into an involuntary resignation." *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (citation modified). The Second Circuit has explained that "working conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (citation modified). Moreover, the Second Circuit has explained that "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually," the various conditions that an employee encounters are to be treated in an "additive" manner, rather than as "separate and distinct." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996). However, "mere dissatisfaction with working conditions, or difficult or unpleasant assignments, does not as a matter of law constitute a constructive discharge." *Cruz v. Sullivan Cnty. Gov't Ctr.*, No. 21-CV-06410 (NSR), 2025 WL 2773187 (S.D.N.Y. Sept. 29, 2025) (citing *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir. 1993)). Finally, "an employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive

discharge." *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013) (citation modified)..

Iurato argues that "[p]olicy after policy implemented by Singh negatively impacted Iurato and her team and her team's accomplishments were constantly minimized." Pl.'s Mem. 23. Yet dissatisfaction with working conditions and unpleasant assignments does not amount to a constructive discharge. The conditions had to be so intolerable that someone in Iurato's shoes would have felt compelled to resign. Iurato's subjective view that the only course available to was to resign does not suffice. *See Gadbois v. Cumberland Farms, Inc.*, No. 3:21-CV-1509 (SVN), 2024 WL 4226908, at *12 (D. Conn. Sept. 18, 2024) ("In general, the denial of a promotion, criticism of an employee's work performance, or an employee's dissatisfaction with his job responsibilities and assignments do not suffice to establish a claim of constructive discharge.") (quoting *Zephyr v. Ortho McNeil Pharm.*, 62 F. Supp. 2d 599, 608 (D. Conn. 1999)); *Nakis v. Potter*, 422 F. Supp. 2d 398, 415-16 (S.D.N.Y. 2006) ("Although plaintiff may have personally felt that her work environment was intolerable, the test for constructive discharge is an objective one.").

Iurato maintains that she had no recourse once placed on the PIP. She argues: "[b]eing placed on a PIP, where she would be expected to show substantial improvement with ongoing open headcount and thousands of new customers while others placed on a PIP received full headcount and profitable account assignments as part of the reorganization, was setting Iurato up to fail." Pl.'s Mem. 23.

However, it is undisputed that the PIP provided Iurato with a chance to improve and stay at Frontier. Failure to meet quota did not necessarily lead to termination. Iurato has admitted that "[w]hen Singh placed an employee on a PIP, it was not a termination of

employment; it rather was a notice of the need and opportunity for improvement." Pl.'s L.R. 56 (a)(2) St. ¶ 55. Iurato also does not dispute that she "understood from her prior experience discussing PIPs with subordinate employees that a PIP provides a period of time in which to improve." *Id.* ¶ 64.

Iurato acknowledges that when Singh emailed her and the other underperforming sales leaders, she "understood Singh was inviting all such underperformers, including her, to seek his assistance." *Id.* ¶¶ 23, 24. When Iurato responded that "I most certainly understand the importance of making quota," Singh replied to her saying, "[i]f there is anything I can do to help please reach out." *Id.* ¶ 25. Singh testified that there were "a lot of people that went on PIP, came out of PIP and became good performers." *Id.* ¶ 55. In addition, Lyons, the Vice President of Human Resources, explained the PIP process in her deposition as follows:

> Are you meeting expectations for sales or not? If you're not, then you get time through a PIP. A PIP -- we have many employees that are on PIP that improve and are still with us. So a PIP isn't some sort of like a death nail, kick you out of the company. It's, Hey, we're letting you know you're not meeting quota, we want you to improve, you're getting time to improve. And I have many employees that are still with us now that were, and then there's some that aren't. Many that are not.

Lyons Dep. 37-38, ECF No. 43-6. Indeed, like Iurato, Rome received a PIP and a rating of 1 from Singh, yet remained employed at Frontier for two years after being placed on the PIP. Pl.'s L.R. 56(a)(2) St. ¶ 60.

Iurato does not dispute that during the meeting in which she resigned, Singh explained "that the PIP was a plan to help her get better." *Id.* ¶ 63. Iurato says she resigned because "it was my heart that took over during my conversation with Niraj [Singh]." *Id.* ¶ 68. Although Iurato may have felt she should resign when faced with her PIP, the standard requires that a

reasonable person would have found the workplace so intolerable as to feel compelled to resign. *See Nakis*, 422 F. Supp. 2d at 415-16.

By immediately resigning, Iurato did not explore alternative avenues to staying at Frontier. *See Simmons-Grant*, 915 F. Supp. 2d at 506 ("An employee who fails to explore alternative avenues offered by [his] employer before concluding that resignation is the only option cannot make out a claim of constructive discharge."). I conclude based on the record before me that a reasonable jury could not conclude that the conditions of Iurato's employment were so intolerable that a reasonable person in her position would have felt compelled to resign.

Accordingly, drawing all inferences in Iurato's favor, a reasonable jury could not find that Iurato was constructively discharged. Since Iurato asserts no other basis for finding an adverse employment action, Iurato has failed to establish this prong of her *prima facie* case.

**2. Inference of Discrimination**

Even if Iurato established an adverse employment action, her age discrimination claim would still fail because she has not presented facts supporting a finding that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in a protected class." *Terry*, 336 F.3d at 152 (citation modified).

Iurato's resignation occurred during a PIP meeting on February 7, 2023, where Singh gave her a score of 1 because she had failed to meet her sales MRR sales quota. Pl.'s L.R. 56(a)(2) St. ¶ 52 (though Iurato disputes what her exact MRR percentage was).

In the period prior to August 2022, Managers or Directors such as Iurato would be given quota relief when a salesperson left until the position was filled. *Id.* ¶ 18. Singh was hired because Frontier wanted to achieve profitability after it emerged from bankruptcy. *Id.* ¶

6. After August 2022, in order to drive Managers and Directors to fill positions quickly, Singh changed the head count policy such that no teams received quota relief. *Id.* ¶ 19.

Iurato argues that "only [she] was continuously placed in a position where she was working with the lowest headcount." Pl.'s Mem. 22. According to Iurato, she was the only one "measured against an artificially high headcount and refused head count relief." *Id.* Yet she has not disputed that the policy of no quota relief from reduced head count "applied across all sales leaders regardless of region and no exceptions were made." Pl.'s L.R. 56(a)(2) St. ¶ 19. It is further undisputed that "no one made any comments to her suggesting Singh's policy of no quota relief for open headcounts was based in any way on her age of gender." *Id.* ¶ 21. When Iurato asked Singh for relief, he responded in an email, "We are not making any exception. Each frontline leader is responsible for the full quota." ECF No. 43-13, at 3. When Iurato followed up, Singh reiterated, "Every leader is in the same boat – that is what we expect the leaders to manage. The VPs nor me get any relief for HC [headcount] – we all still need to deliver the full quota." *Id.* at 2.

Iurato also argues that she was the only one who had "her most successful salespeople and existing accounts taken away from her in the reorganization," causing her reduced headcount that made it difficult to make her quota. Pl.'s Mem. 23. Yet it is an undisputed fact that the goal of Singh's geographically-motivated reorganization plan was to "make every region equitable and make sure that nobody was driving more than two hours to go see customers based on where they were living." Pl.'s L.R. 56(a)(2) St. ¶¶ 34, 36 (citation modified). It is also undisputed that Frontier made changes "across the country" that affected "every region, every sub-region in the country." *Id.* ¶ 36.

The introduction of the PIP program similarly applied to everyone. When asked about the PIP program in her deposition, Iurato answered: "It basically put everyone -- it basically said that anyone that had not achieved 50 percent of quota or better for September and October was on a plan." Iurato Dep., ECF No. 51-1, at 184. Indeed, on November 4, 2022, Singh emailed Iurato and eleven managers stating that they did not meet their team quota for October and asking for an action plan to reach their targets. Pl.'s L.R. 56(a)(2) St. ¶ 23; ECF No. 43-14, at 4. The idea to email all the sales managers originally came from a McKinsey consultant who urged Singh to "follow up with those managers" who did not meet their quotas. ECF No. 43-14, at 4. These managers, including Iurato, were selected after McKinsey "ran the numbers on quota achievement." *Id.*

No evidence suggests that the evaluation of Iurato's PIP itself was due to any discrimination against Iurato on the basis of age. Iurato admits that all "sales employees who reported directly to Singh and who received a rating of 1 in 2022 also received a PIP." Pl.'s L.R. 56(a)(2) St. ¶ 54. Iurato also admits that Singh placed her on a PIP on February 7, 2023 "[b]ecause of her performance." *Id.* ¶ 59. In the East sales region, Singh placed both Iurato and Rome, a younger man, on PIPs. *Id.* ¶ 57. When Iurato resigned, she explained that she "lost faith in Frontier valuing her as an experienced leader. Leadership is more than just a number. . . . [but] Singh was just looking at a number and saying you're a failure. He didn't look at anything else." *Id.* ¶ 66 (citation modified).

In conclusion, there is no evidence that the circumstances of Iurato's employment and decision to resign, namely the change in quota policy and subsequent PIP evaluation, had anything to do with Iurato being a 65-year-old woman. The policies were companywide, applied on the basis of sales metrics, and not targeted at Iurato individually. Other employees

who were not part of a protected class, namely Rome, received the same treatment. Even interpreting the evidence in the light most favorable to Iurato, a reasonable jury could not conclude that Frontier's actions were motivated by Iurato's age.

Accordingly, I grant Frontier's Motion for Summary Judgment as to Count One (age discrimination in violation of the ADEA), Count Two (sex and/or gender discrimination in violation of Title VII), and Count Three (sex and/or gender and age discrimination in violation of CFEPA).

**B. Retaliation**

Iurato's remaining claim, Count Four, asserts a claim of retaliation under Conn. Gen. Stat. § 31-51q. *See* Compl. 28. A district court may decline to exercise supplemental jurisdiction over pendent state law claims if it has dismissed all federal law claims. 28 U.S.C. § 1367(c)(3); *see One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims.").[6] When deciding whether to exercise supplemental jurisdiction, courts weigh the factors of "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), *abrogated on other grounds by Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 39-41 (2025). The Second Circuit "has held, as a general proposition, that if all federal claims are dismissed before trial, the state claims should be dismissed as well." *Motorola*

[6] The Complaint does not assert diversity jurisdiction, and it does not exist here as both Iurato and Frontier are Connecticut citizens. *See* Compl. 1-2.

*Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (citation modified). Accordingly, I decline to exercise supplemental jurisdiction over Iurato's state law claim.

## IV. CONCLUSION

For the reasons stated, I grant Frontier's Motion for Summary Judgment as to Counts One, Two, and Three. I decline to exercise supplemental jurisdiction over Count Four and dismiss that Count without prejudice to refiling in state court. The Clerk of the Court is respectfully directed to enter judgment accordingly and close the case.

**SO ORDERED.**

New Haven, Connecticut
September 18, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge